Good morning, Your Honors. I would like to reserve two minutes for rebuttal, if I may. I'm going to start with the injunction. Whether we look at the injunction as overly broad or unduly vague, the basic problem is that you can't have an injunction which prohibits plaintiffs from truthfully advertising that the configuration works in general and that a lack of any reported failures. And that's something that the Court in its own decision indicated were the facts, and that they should be able to. However, here, the Court, by stating that its ruling on the measured zone, quote, necessarily implicates, unquote, the configuration, and by inserting into the injunction itself a comparative requirement to NFPA 780, it has a different configuration. The Court oversteps that bound and violates the First Amendment and Ninth Circuit precedent. And we're going to ask, I'm going to argue Can you just help me? What is the offending language in the, precisely in the injunction that you're complaining about? The injunction in several places makes reference to NFPA 780. It is, we have proposed an order which would adjust the problem. Our proposed order appears at pages 1403 to 1404 of the record. What we are saying here, Your Honor, is that because this was a case based upon a finding of literal falsity, and because the Ninth Circuit has made it clear under Gallo Winery, U-Haul, and Standard Oil that the order must be tailored to limit only the that that order, which throughout it, it has six different restrictions, that order goes beyond the two specific things that were found to be literally false. Okay. Counsel, let's deal with the NFPA 780 problem. I'm looking on page two of the injunction, and I see that there are a couple of references to NFPA 780. A couple of them are in the specific numbered paragraphs, and there's one in sort of the preamble, the therefore it is ordered that. If we deal with those requirements, can you tell us what language you would like to see stricken from this? I understand you prefer your proposed injunction, but that's not what the district court ordered. So maybe you could help us understand what you would like stricken. We would like stricken the portions that, for example, greater than the systems. It says, for example, in paragraph one, it says plaintiffs are enjoined and restrained from utilizing air terminals that provide a measurable zone of protection greater than systems installed in accordance with NFPA 780. Your problem is the comparative phrase, greater than systems installed in accordance with NFPA 780. Is that the phrase you would like stricken? Yes, that is the phrase we would like stricken, because what it does, it prohibits us from advertising the I thought that was the finding of the judge below, is that the comparative was misleading. In other words, I can understand a removal of the reference to the NFPA 780, but not a bar against saying that your system provides greater protection than the traditional Faraday system. Well, as we understood the ruling below, the court said that it made no findings that AESC systems were unsafe, and in fact it couldn't, because there was no record evidence. That's not what I'm talking about. Yes. I'm sorry, Your Honor, if you could restate your question for me. It's the comparative nature of the advertising that I thought she was attempting to bar. She was barring our advertising of a measured zone, and our advertising of open spaces. Those were the two things that she was barring. This was not a comparative advertising case. It was a literal falsity case. There was no record evidence here of any consumer confusion that would be necessary to bar comparative advertising. It was not a comparative advertising decision. But if the falsity is that yours protects more than the other, then it's not a comparative advertising decision, then isn't that an appropriate, isn't that appropriate language to bar? Well, if we look at putting, if we put NFPA 780 into this prohibition, into this injunction, what we're doing, in essence, is restricting us from advertising a system that conforms with our method of installation. Both the NFPA, NFPA 780 itself, in fact, does have its own measured zone. And that measured zone, if you look at the record at page, at page, excuse me, at page 1368, NFPA 780 starts with a 150-foot zone. And that zone is not, is based upon field experience, just as this system is based upon that. So just simply remove the reference to the 780? Excuse me? Is that what you're asking? Just have us, you know, remove the references to 780? To remove the references to 780 and to allow us to affirmatively state that our, our configuration is based on historical experience. If we cannot, if we cannot advertise truthfully that the con, if we are restricted to NFPA 780, if NFPA 780 is, is, if we're required to conform to that, in essence, we're, we're restricted from engaging in truthful advertising that our configuration works in general and has been installed for over 25 years with no, no systems, no I don't see the relationship between safety working, between being able to advertise that it's safe and it works, and, and what you're objecting to, which is the standard. I guess I'm not Well, if we, if we look at the arguments that are made by East Coast here, what they are saying, in essence, is that we can neither advertise or install a system with its own configuration. We must conform to the configuration of NFPA 780 based, and they point to, and at the heart of this problem comes up where the court states at page 4, it's in 1440 of the record, the court states that her ruling on the measurable zone was necessarily directed to the configuration of ESE systems advertised. If you say to us that we, that we must conform to the NFPA 780 system, what you're saying is that we have to install a multipoint system. This is not a multipoint system. This, in most instances, is a singular point system, depending on the configuration, but the configuration itself is something that we should be able to advertise, and the way, the way this, if we look at the arguments made by East Coast, the vagueness and over-broadness of this requires us to impose the system that we're in competition with, rather than our own system. Let me, let me go back, let me go back to the injunction so that I can try and figure out, because maybe that will help eliminate the legal arguments. I'm still trying to figure out what language it is that you object to. If the language in paragraph 1 is the, is the language that you, that we have previously discussed, but it's greater than the systems identified in accordance with NFPA 780, is that the only language, is that the language in, in section 1 that's, that you find offensive? That is, that is the heart of the offensive language. Okay. Is that the language that you'd like stricken from paragraph 1? I would like that language stricken from paragraph 1. Okay. Is there anything else in paragraph 1 that you're asking the Court to strike? The, basically the language that, that we cannot, that we cannot advertise a zone of protection greater than systems installed in accordance with NFPA 780. Okay. All right. Now. For all of section 1? No. No. No. So you want to be, you want to be told that you're enjoined and restrained from advertising that they sell a lightning protection system utilizing air terminals that provide a measurable zone of protection? What we That you, you, you, you're satisfied to be, to be barred from advertising that you provide a measurable zone of protection? We, we do, we, we are not in our advertising, and we are trying to comply with this order, even though it's vague. We are not advertising a measured zone of protection. What we are advertising But it's measurable, not measured. It's measurable as stated in this paragraph. I think you have a, you should be having a problem with the entire first paragraph, to be blunt. Well, we, we do have, what we're saying is that all we wish to be restrained from advertising is the measured, is a measured zone of protection that we, we accept that. We, what we are saying we should not be restrained from, from advertising our system, our configuration of our system. For example, we have installation manuals that, that instruct you on how to install this system. Those manuals are not advertising a measured zone. They are, they are, they are advertising and showing, what they are advertising is the configuration of the system based upon our 25 years of experience. Let me ask you. Not based upon testing or a measured zone. Did the district court judge find, actually find that the systems do not provide a measurable zone of protection? What the district court specifically found is that the ESC products, what, what they said that was, was false advertising was that they provide a measured zone of protection. And this was in the record what the zone was. It was very specific and, and it was in our portions of our advertisements that said we protect against open spaces, lighting in open spaces. Those were the only things that were found to be false. So in other words, as to paragraph one, what you want is to change the word measurable to measured, take out the comma. And so in other words, that it would bar you from advertising that your system provides a measured zone of protection greater than the systems installed in accordance with the NFPA. Does that, would that be acceptable to you? Yes, that would be acceptable to us. All right. Let me also ask then, the last phrase, how the system can function effectively to protect open spaces. Do you object to that language in paragraph one? That portion we do not object to. So in other words, your system does not provide protection, effective protection in regards to open spaces? We, well, the ruling below was, the ruling was that she found, the two things that she found to be literally false were the measured zone of protection and the open spaces. And we're willing to accept that. But we want to be able to advertise and install our system in its own configuration based upon the 25 years of experience that we have had with the system. Let me ask you, do you plan to argue the sanctions issue at all? Yes, I plan to argue the sanctions issue. You have 7 minutes and 39 seconds. Okay. With regard to the abuse of discretion in the sanctions section, first of all, section 1927 governs sanctions to be paid by attorneys. Even the defendants admit that the Court abused its discretion in ordering plaintiffs Assuming that that first basis is out and the second basis is out and she's just going on inherent power. What's your argument? My argument on inherent power is that inherent power requires, it's limited to exceptional cases where conduct is clearly frivolous, legally unreasonable, or without legal foundation. That is not the case here. Let me ask you, does Arizona, District of Arizona have a local rule that requires the parties to meet and confer to attempt to resolve issues prior to bringing a motion? Yes, it does. Which local rule is that? I don't have the number with me, but it does require that. Was that complied with here? There was no discussion that we had beforehand with regard to the motions, no. What I would want is that you submit to the Court what that local rule is. Yes, Your Honor. Also, let me ask, between July of 2001 and July 22nd of 2002, the docket sheet shows basically about 16 entries, most of which were administrative stuff, but there were some references to discovery disputes. What were the nature of discovery disputes? I believe those had, we're not sure, and I just asked my co-counsel, but we believe those had to do with redeposing Drs. Risen and Moore. All right. And insofar as the New York judgment that you got in July of 2001, you indicated I'm sorry, Your Honor? In regards to the judgment that was obtained in the State Court in New York in July of 2001, you've indicated that there were post-trial motions. What type of post-trial motions were those? There were post-trial motions to set aside that verdict. There also were, was an appeal, which actually was successful, and that's one of the points we're making here. We had made no decision in July. My primary reasons for making the decisions When you said it was successful, it was successful for who? Against us. We lost that entire We did lose the appeal, and we lost the entire judgment. All right. And when did that occur? It was sometime in 2004. 2004, I believe. And all right. I understand. Okay. Go on. Can you just explain to me on the sanctions what was so unfair about sanctioning you? Well, what we were doing in that, in not opposing that motion, at that point in time, was evaluating the summary judgment motion and making our decisions as to how it was that we were going to focus our case for trial. When we saw the, and we were required, actually on reconsideration, once my clients were sanctioned, to disclose attorney product, our thinking and our reasoning. When we saw that they were not opposing, that they were not going to pursue certain motions, excuse me, certain counterclaims with respect to their Lanham Act claims, we then knew that we could simplify the case and keep certain fact issues out of the case, which might have confused the jury. And that was the primary mover in our decision making. There was, in part, the fact that we had a $1.6 million verdict. But that wasn't something that was sufficient for us to make the final decision because it still wasn't final. And as I just mentioned, that verdict eventually was overturned, as one could expect as an attorney, that that can happen. And so, to say, if we are going to- So you were actively considering your- My options. Your options in the light of changing circumstances throughout this whole period? Exactly. And one of the things that really affected the ultimate decision were the summary judgment motions, which I evaluated when they came in and made my decisions based on that. As we always do as attorneys, and this would set a precedent that would put us in the position of not being able to face sanctions for streamlining our case before going to trial. Okay. I think that with the other side, we'd like to hear from the other side on that. And also the other side, your adversary may be able to enlighten us as to the nature of the case. Okay. And I would like to reserve my rebuttal time, if I may. You may. You may. Thank you. Good morning, your honors. My name is Beth Gilson. I'm the lawyer for East Coast Lightning Equipment. And I'd like to talk about the injunction and the sanctions as well. I want to start out by noting that when Congress enacted the Federal Trade Commission Act, there's a language to the effect that there's no limit to human inventiveness in the area of advertising. We've certainly seen that here. These plaintiffs claim to have built a better lightning rod, an enhanced lightning rod. One rod can be used in place of dozens and even hundreds of rods in a conventional system that has bonding from rod to rod, down and down grounds. I think the panel has already conceded that there is a basis for an injunction. The question is, is the injunction that was issued by the district court overbroad and vague? Okay. And certainly we'd argue that the standard, the policy behind the injunction is to keep the violator from violating further. The FTC, which courts look to in reviewing injunctions, talk about fencing in provisions. These people have advertised that their products protect in open spaces, and the advertisers right now. They've conceded open spaces out. They're not going to advertise that it provides. Okay. Right now, Ms. Joseph has said she wants to install systems in her own configuration. The configuration they recommend in their materials, which she referred to, is one rod every 380,000 square feet. That is a specific and measurable range of protection, so that if their systems, meaning one rod, are installed, one every 380,000, actually 378,000 plus square feet, that means that they have to rely on unproven, unverified radii of protection, which the court specifically found were not backed up by science or technology. Let me just, the word configuration means how many, what does it mean? In the context of the conventional system, a configuration is one rod every 20 feet bonded and grounded so that lightning is directed safely to the ground. Plaintiffs have used the word configuration to mean a system that includes one rod, as she calls it, a single point system. There's really no configuration at all, but the system itself is one rod that purportedly has enhanced powers and can protect huge, vast acres, seven acres, and that is what their installation manual requires, and that's why we're saying that this injunction cannot allow these systems to be in system. Counsel, when I asked specific questions to Ms. Joseph about the injunction and the language that she would like stricken, my understanding was that she was prepared, and in their own proposed injunctive language, they were prepared to concede that they cannot advertise that their terminals provide a measurable, Judge Wu suggested maybe they wanted the word measured instead of measurable, zone of protection. They're willing to concede all of that. The question was whether they would also be prohibited from advertising systems installed in accordance with NFPA 780, and the objection, as I understand it, from Heery Brothers is that the district court didn't make any findings about NFPA 780, and so they'd like that language stricken because it's overbroad. I haven't heard anything yet that you've done to address her argument. The district court approved this language, and it itself suggested 780. What the original language that East Coast proposed was that was not in conformance with U.S. safety standards. The court thought that was too vague, and it pointed to the testimony of Dr. Martin Heumann, our expert, the foremost expert in the physics of lightning, who said that 780 system was the baseline installation configuration that we were to look to. And that language is in the court's decision of September 9th in the record, and that is on page 1440, because the conclusions in Dr. Heumann's report on which the court relied are based on NFPA 780 as the baseline installation configuration. The proposed injunction will be amended to substitute NFPA 780 for the term U.S. safety standard requirements. Okay. That's on September 9th? Yes. What page of the court's opinion is that on? It's on page 1440. Yeah. That's the record. Do you have the page on the? Yes. 6 and 7. 6 and 7. Thank you. And so that that language was the baseline. If that's the standard for a safe system that safely sends lightning to the ground, there needs to be a basis for a deviation from that system. And right now, plaintiffs may concede that they're not going to specifically say in their brochure. Let me stop. Did she find, did the judge below find that the ESE system and similar enhanced air terminal systems don't work? Don't work? What does work mean? Work? Well, that is the point, isn't it? That's the problem here. This is what plaintiffs want to say it works. Works is not a term of art. What we say is there are no enhanced properties. Rod for rod. I understand that. I understand the comparative aspect of it. I understand, and I don't necessarily disagree with the district court judge. But it seems to me that if you have a system that works to some degree, why can't they advertise that it works to whatever degree that it does work? Because the law says that you cannot make specific representations about a product, in this case a product that can be installed one every 370,000 square feet, and not have some sort of science behind it to back that up. Well, there is evidence of the record that indicates that, for example, the quote from the report from the National Institute of Science and Technology, it concludes that it's nearly impossible to make a quantitatively meaningful statement or judge us about the performance of the ESE device in comparison with the conventional Franklin rods. Which means they should be installed in the same configuration or give us a reason for allowing a deviation. Why? Because the science isn't there. If one rod, the conventional rod, has no more or less attraction to lightening than the ESE rod, which is what the science says. But at this point in time, the injunction is currently written, if they go out and get the study that shows it, they can't advertise it because of this injunction. I'm sorry? If they got the proof that you say they don't have, they can't advertise it under this injunction. Well, I think that they can always go back and modify the injunction. Right. And we've had years and years and years for them to come up with one scintilla of evidence. The scientific community is 100 percent behind the statements of Dr. Uman that lightening is does not behave the way that they say that one rod can provide and protect these vast seven-acre areas. This case was filed in 1996? Seven. Seven. It's been many years. And as you saw from the pleadings that went through the NFPA process, time after time, study after study, if there's no difference between the rods, then there can be no basis for deviating from the standard. And that's why the language 780 is in there. That's the basic standard. It doesn't say they have to conform to 780. It just says if there's going to be a deviation from 780, there needs to be some science. And the way they're recommending their configuration is not based on science. And to say it works, they have no evidence it works other than their own anecdotal evidence, which the Court specifically found in this same September 9th case, that anecdotal evidence, if true, we don't know it's true, but anecdotal evidence of the lack of failures does not prove that the systems are based on a scientific principle. But if she doesn't make the finding that it doesn't work, I don't understand how she can make the finding that they can't advertise that it works in some way, shape or form. Here's what she makes. Here's her conclusion. The conclusion is that they don't perform as advertised. Now, if you want to say that means they don't work, we can. Work was not used in here. What they did was say you can't advertise a product that doesn't have the characteristics you're saying it has. That's false advertising. And it – pardon me, Your Honor. No, go ahead. And it affects consumers. If you were a consumer, wouldn't you like to have – what a good deal. That would affect your purchasing decision to get one rod in the – instead of a whole system. Any lawsuits on the basis – any tort lawsuits on the basis of the ESE system? Yes, sir. How many? Not tort. Various lawsuits for damage. Look, let me ask this. As I heard – as I understood the argument, it is they're willing to take away any reference to the – to being better than the standard. But they want to be able to advertise their, quote, configuration. If I – and I didn't understand exactly what that meant. If I understand what you're saying the configuration is, the configuration of the standard lightning rod is that it has to be – there have to be lightning rods every 20 feet and they have to be properly grounded, whereas the configuration that they want to advertise is that you have to have one lightning rod for every 40 feet or 50 feet or whatever. Acres. Acres? Seven acres. Seven acres. Okay. We can – all right. And so any advertisement that in essence says that there are – they need – you need fewer of these lightning rods than you would the conventional lightning rods is essentially a misleading – it essentially relies on unscientifically verified ranges of protection, whether it says it flat out or whether it's just in the materials that says you only need one. That is a deviation that has no scientific basis and that's the essence of the Lanham Act violation for false advertising. And any way you get around that, you need to have the science and it's not there. And that's why this language is critical to the injunction in your view. Well, it's all critical. Paragraph 2 also says you can't rely on a system utilizing air terminals that rely on calculations of enhanced range of protection. If they argue that you can put one every 380,000 square feet, that's a calculation of an enhanced range of protection. So they can't make that recommendation of that configuration. We're talking about a product that doesn't work. And so if a product doesn't – There was no – it wasn't alleged that it didn't work. That was what the court said and these plaintiffs have taken it out of context. We do have – what the court said was we have said that this product is no different – the evidence says, Dr. Heumann says, the NFPA says, rod for rod they're the same. And therefore, you've got to look at the configuration. If they're no different, then if the configuration is different, how can it protect the way they're saying? Do you want to go to sanctions? Yes. The sanctions issue, in this case, it wasn't a question, as Ms. Joseph said, of the court requiring her to come up with her mental – attorney mental impressions. In this case, Ms. Joseph gave reasons why she failed to withdraw the claims. And they were all reasons that had been in existence for at least one year before we went to the trouble of filing the claims. Well, let me just ask, one of the reasons was the fact that they had won a verdict in the New York State court, but that verdict wasn't a final verdict. It was – I believe it was final, but more importantly – Well, she's indicated that it was reversed on appeal, so how could it have been a final verdict because it was still on appeal? In other words, they did win in the trial court. There's no dispute about that, but there was appeals thereafter. And if there were appeals thereafter, what – you know, they could have said, well, we have this judgment on this one, so therefore, it's similar to what we're claiming in count two, and so therefore, why should we proceed this because it's going to confuse the jury to argue this point, so let's not even – let's just concede the counts two, three, and four, and let's go after the big ones, which is, you know, one and five. Well, her pleadings say that she'd already received all the damages they were going to get in that case, and that they'd received them before we ever spent the time and money to file them. Potentially received them, not necessarily received them. But let me just ask you this. In this particular situation, in order to – for the judge to, you know, issue under the inherent power, there has to have been a finding of actual bad faith. Is that correct? Yes. Where is the finding of actual bad faith? The bad faith was, in the judge's opinion, that they multiplied the proceedings vexatiously. In what way? By having a – by – well, for example, it's like – Where is the evidence of that in the record? Okay. In the record, they talk about the Lanham Act – the Lanham Act claim against East Coast and the common law unfair trade practices case was based on our claim that the 780 was a safety standard, whereas they said – the NFPA says it's not a safety standard. And then she looks in the book and sees that from 1997 until 2000, this is – Was discovery on that issue so different than discovery on the issues as to the claims of one and five? Well, certainly on the tortious interference claim, the discovery was different. We spent a week in Ithaca, New York, deposing this testing lab. On the Lanham Act claims, we were – we were defending claims that were made that – Let me ask you, in the – between the time of the July of 2001, where supposedly the – you know, they should have woken up as to the viability of those claims and the time that your client filed the summary judgment motion was a year. And if you look at the docket sheet entries, there's only 16 entries during that period of time, most of which were on administrative matters, not on substantive matters. So where was this, you know, desire to multiply and increase the cost and be vexatious? I believe the desire, as the Court found, was manifested back a year and even more years ago when they knew that this – these cases were – But she didn't make a finding as to that. She said the finding that she made was that certainly as of July of 2001. And she didn't indicate that prior to that point in time, they should have actually realized it. Her finding was that as of July of 2001. She said certainly as of July of 2001. That they already knew? Isn't that a fact? That they should have known, but that's because they conceded that that's when they won the, you know, State court judgment in New York. But as it turns out, that State court judgment was overturned on appeal, and there were post-trial motions. So I don't understand how they should have realized in July of 2001, based in part upon the, you know, that they won in New York, that they somehow should not go forward and oppose the count. Is that was – is that in this record? I was just not clear that they – you moved for summary judgment on these claims. Correct. And there was no – there was no contest? We moved for summary judgment, and at that time, the plaintiffs withdrew the claim. Withdrew the claim. And they – and the district court said you should – you should have explained – you should have done this a year ago, because nothing – you've known all along, and you required the other side to file, prepare, and file a motion for summary judgment. Well, no. The summary judgment was as to all counts, though, wasn't it? It wasn't as just to those three. The summary judgment was for East Coast against the plaintiffs. And on all counts. So in other words, they opposed some of the counts. But not these. But not two, three, and four. Correct. Well, we – the summary judgment on the Lanham Act, they opposed. Let me ask you. If they had opposed two, three, and four, would they have been sanctioned? Well, it certainly would have been reason – it wouldn't have made us go to the time and expense of doing discovery. I didn't ask that. I said if they had opposed two and three and four, would they have been sanctioned? In other words, would Judge Silver have found that even if she decided the issues against them, would they – she have sanctioned them at that point? Well, I – And on what basis? And if that's the case, then why aren't you making the argument that, you know, it's better for them to have opposed and cost you more money at that point in time than to have said, oh, we're not going to oppose, and then wind up being sanctioned? I take it that what the – what the district court was saying was that any response you could have filed would have been frivolous because you knew – because there's no merit to these, and you knew it a long time ago. So it wouldn't make sense to file a case. Well, and that is what the court found. But she didn't make the factual finding for that, did she? She made the factual finding based on what the representations of counsel were, that the reasons she didn't go – The only reason that it transcribed was because of the fact that they hadn't opposed. But if they had opposed, she would have made that inquiry. But Ms. Joseph didn't say what you said, that they – they knew for a year that they'd won. And she didn't say, and this dragged on and on, and we didn't know up until the time of the summary judgment. But in fact, do you have any evidence that – that is contrary to that? At this point in time, she has made that argument to us on appeal, that that is, in fact, what happened. And apparently, she's correct on that. Well, I'm not – was there a motion – there was no – there was no opposition with respect to these claims. The sanctions were imposed. Was there – what does the record show? Was there a motion to reconsider, or was there a response with respect to – or something filed with respect to the sanctions that explained what was going on in all – during the interim period? The court found that these plaintiffs engaged in conduct that vexatiously multiplied the – without rational explanation, they intended to maintain these claims to cause East Coast to defend against four claims instead of one. And that that was bad faith under her inherent court's authority and under 28 U.S.C. 28 that reached for litigation abuses. That reached – Is there a local rule that requires a meet and confer before a motion is filed? I believe there is. Was that done here? Your Honor, my counsel who filed the motion believes it was done. I didn't see any record of it. But I didn't see any objection to it. The problem, though, is that wouldn't it – in other words, if there had been a meet and confer and they said, oh, we're not going to oppose this, don't bother making a motion, we'll just concede the point, they wouldn't have been sanctioned with it. We'll just concede the point that we caused you to take six years of litigation? No, at that point in time, on those issues. Now, the reason that the whole point of the meet and confer is to avoid the expenditure. Even after the summary judgment motions were filed and – and after plaintiffs had conceded the summary judgment. Insofar as the sanctions were concerned, what were the – what were the sanctions based on? Sanctions were based on – Monetarily. Oh, on our costs only for preparing – Only on the summary judgment, is that correct? Only on the summary judgment, correct. Well, okay. Thank you. Thank you. I'd like to make just a brief rebuttal, if I may. Yes. One, there was a motion for reconsideration, and I did explain my – my reasons. And, you know, again, I – I think that the sanctions should be overturned. But I would like to focus primarily on the injunction again. I'd like to make it very clear that configuration does not imply a measured zone. These two different systems have – they're each – What do you mean by configuration? I think the best way for me to understand – to explain it to you is to explain how these systems are designed. Each system is designed specifically for the particular project. We have something called a manufacturer's standard that we use. It's in our advertising and the record at pages 1406 to 1420. The system is designed for the building and for the system. And I think that if we look at the – I mean, we've been told here that 780 is scientifically based. Their configuration is no more scientific than our configuration. And I'm going to point to specific provisions in the record about this. The defendant's expert, Uman, at the time of his deposition testified, quote, the zone of protection is not a theoretically well-justified concept, but it works in practice, unquote. That's at the record at page 562. In scientific journals, which are also in the record at page 1180 to – and the whole – there's an entire scientific article at 1180 to 1191. The theoretical justification of the conventional approach – this is NFPA 780 – is fairly crude in part due to our incomplete understanding of lightning's attachment to ground-based objects. Hence, the fact that the conventional lightning protection systems have a history of success in preventing a – or minimizing damage to structures is the primary justification for their use. It's not scientific. Neither system – we're not saying – and as we've conceded, we're not going to base our advertising on a measured zone. But we should be permitted constitutionally under the First Amendment to advertise our own configuration, which is no different than theirs. It's no more or no less scientific. This record is replete with these – Well, let me stop you. The major point here is whether or not the numbers of your product versus the numbers of their product do the same thing in the end. They're saying that it doesn't. There's no evidence that it doesn't. So therefore, when you say you should be allowed to advertise that there is – that you can use one for, like, seven acres or something like that, that is what's false. And that is supposedly what's found to be false by the district court judge. As, in fact, the district court judge specifically ruled that we should be permitted to advertise our 25 years of success and no failures. She specifically said in her decision that we should be permitted because we should be permitted to do truthful advertising. Now, we heard today that our system is unsafe. We've been in litigation for over 10 years. We've given them our entire list of customers, our entire list of projects. They haven't come up with one single – and there is no lawsuit in this record. The only lawsuit in this record was a lawsuit that was referred to in false testimony before the NFPA where the owner of the property said he wasn't – that it was other causes. You have Easter time. I'm sorry. I'm sorry. It's just argued as submitted for decision.
judges: Schroeder, Bybee, Wu